**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICHOLE JACOBSEN, KATHERINE KING, DEBORAH DALRYMPLE, LAURA PHILLIPS, and JEFFREY HUNTER, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>    v.<br><br>LONG ISLAND COMMUNITY HOSPITAL, ROBERT SCHWARZ, ERNEST PATRICK SMITH, LISA ROSE, RICHARD MARGULIS, JAMES MAIORINO, WALTER LADICK, MARK MULHOLLAND, MARC ADLER, and FREDERICK C. BRAUN, III,<br><br>      Defendants. | Case No. 2:24-cv-00386-GRB-ST<br><br><u>**THIRD AMENDED CLASS ACTION COMPLAINT**</u><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs Nichole Jacobsen, Katherine King, Deborah Dalrymple, Laura Phillips, and Jeffrey Hunter ("Plaintiffs"), individually and as representatives of the Class defined herein, and on behalf of the Brookhaven Memorial Hospital Medical Center DBA Long Island Community Hospital Retirement Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§1001-1461 ("ERISA") against Defendant Long Island Community Hospital (formerly known as Brookhaven Memorial Hospital Medical Center) (the "Hospital") and current and past members of the Hospital's Pension Committee: Robert Schwarz, Ernest Patrick Smith, Lisa Rose, Richard Margulis, James Maiorino, Walter Ladick, Mark Mulholland, Marc Adler, and Frederick C. Braun, III ("Individual Defendants", and together with the Hospital, "Defendants") for breaching their fiduciary duties in the management, operation and administration of the Plan. Plaintiffs bring this action to remedy this unlawful

1

conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

**INTRODUCTION**

1.      Plaintiffs are participants in an ERISA defined contribution plan sponsored by the Defendant Hospital. Today, 26 U.S.C. § 401(k) and § 403(b) defined contribution plans, where employees bear the market risk and must pay the fees and expenses of the investment options, have become America's primary retirement system. Unlike defined-benefit pensions, which provide set payouts for life and where employer assumes the risks and pays the fees and expenses of the investment, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of these plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.[1] These retirement funds are significant to the welfare of the class. Plaintiffs estimate that Defendants have caused losses of at least $13.2 million to the Plan in total since 2018.

2.      The marketplace for services for defined contribution plans is established and competitive. As an ERISA fiduciary to the Plan, Defendants are obligated to act for the *exclusive* benefit of participants and beneficiaries in ensuring that Plan expenses are reasonable. 29 U.S.C. § 1104(a)(1). These duties are the "highest known to the law," which must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982); *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2001). In discharging these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 388 (6th Cir. 2015); see also *Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F.

---

[1]      Nancy Trejos, Retirement Wreck, Washington Post (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

Supp. 278, 296 (S.D.N.Y. 1998). The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments as well as a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 - 1829 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.")

3.     In this case, Defendants failed to meet their fiduciary obligations in basic ways. *First*, the Plan offered and maintained higher cost share classes when identical lower cost share classes of the same mutual funds were available. This resulted in the participants paying additional unnecessary operating expenses with no value to the participants and resulting in a loss of compounded returns. This is one of the most common and well-known example of an imprudent investment decision.[2] An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable methodology for selecting and monitoring mutual fund share classes. For a large plan of approx. $246 million in net assets, such as this Plan, a fiduciary using a viable methodology will monitor the Plan's investment options continuously to immediately take advantage of share class discounts

---

[2]     The need to monitor share classes is so basic that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC registered investment advisors to make sure that advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"), available at https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf ; *See also* FINRA 2016 Regulatory and Examination Priorities Letter, available at https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf.

as they become available. Information regarding share class discounts is made available to the public as part of the online EDGAR database maintained by the SEC. Defendants however failed to monitor the share classes of mutual fund investments and to substitute less expensive share classes of mutual funds from more expensive share classes of the very same mutual fund, thus wasting the assets of the Plan participants. This could have been easily remedied only if Defendants had a viable review process and methodology, which they neglected to keep and implement, violating their fiduciary duties.

4.    *Second*, Defendants wasted participants' money by failing to appropriately select and monitor the Plan's stable value fund. Stable value funds differ from many other investment funds in that they pay participants a contractually guaranteed rate. Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants. Had Defendants monitored and evaluated the returns on the Plan's stable value fund, they would have realized that the Plan's stable value fund was an underperforming fund throughout the entire Class Period and that the Plan's parties in interest were benefitting from the returns on the stable value fund, at the cost of the Plan's participants.

5.    Pertinently, Plaintiffs are not merely second-guessing Defendants' investment decisions with the benefit of hindsight. The information Defendants needed to make informed and prudent decisions, including information about higher available contractually guaranteed rates, was readily available when the decisions were made. Defendants however failed to make prudent decisions and breached their fiduciary obligations. Plaintiffs, individually and as representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties,

4

and to restore to the Plan any lost profits. Plaintiffs also seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.       Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

7.       This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

8.       This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one of the Defendant is located.

## PARTIES

**Plaintiffs**

9.       Plaintiff Nichole Jacobsen resides in Sound Beach, New York and was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period[3] because she and her beneficiaries were eligible to receive benefits under the Plan. During the Class

---

[3]       Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . . ." 29 U.S.C. § 1113. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."). Accordingly, here, the Class Period begins six years before the date of the filing of the initial Complaint.

Period, Plaintiff Jacobsen invested in the Plan's stable value fund, along with the other challenged funds, including the Janus Henderson Enterprise Fund, MFS New Discovery Value Fund, American EuroPacific Growth Fund, John Hancock Disciplined Value Mid Cap Fund, and the Dreyfus Strategic Value Fund (later renamed to BNY Mellon Dynamic Value Fund). As a result, Plaintiff Jacobsen has been financially harmed by Defendants' unlawful conduct. This information is known to Defendants as they have control and possession of all Plan participants' records. Plaintiff Jacobsen's account would have been worth more had Defendants not violated ERISA as described herein. Plaintiff Jacobsen became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

10.     Plaintiff Katherine King resides in Deltona, Florida and was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. During the Class Period, Plaintiff King invested in the Plan's stable value fund, along with the other challenged funds, including the Janus Henderson Enterprise Fund, MFS New Discovery Value Fund, American EuroPacific Growth Fund, John Hancock Disciplined Value Mid Cap Fund, and the Dreyfus Strategic Value Fund (later renamed to BNY Mellon Dynamic Value Fund). As a result, Plaintiff King has been financially harmed by Defendants' unlawful conduct. This information is known to Defendants as they have control and possession of all Plan participants' records. Plaintiff King's account would have been worth more had Defendants not violated ERISA as described herein. Plaintiff King became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

11.     Plaintiff Deborah Dalrymple resides in Selden, New York and was an employee of the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period

6

because she and her beneficiaries were eligible to receive benefits under the Plan. During the Class Period, Plaintiff Dalrymple invested in the Plan's stable value fund, along with the other challenged funds, including the Janus Henderson Enterprise Fund, MFS New Discovery Value Fund, American EuroPacific Growth Fund, John Hancock Disciplined Value Mid Cap Fund, and the Dreyfus Strategic Value Fund (later renamed to BNY Mellon Dynamic Value Fund). As a result, Plaintiff Dalrymple has been financially harmed by Defendants' unlawful conduct. This information is known to Defendants as they have control and possession of all Plan participants' records. Plaintiff Dalrymple's account would have been worth more had Defendants not violated ERISA as described herein. Plaintiff Dalrymple became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

12.    Plaintiff Laura Phillips resides in Patchogue, New York and was an employee of the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. During the Class Period, Plaintiff Phillips invested in the Plan's stable value fund, along with the other challenged funds, including the Janus Henderson Enterprise Fund, MFS New Discovery Value Fund, American EuroPacific Growth Fund, John Hancock Disciplined Value Mid Cap Fund, and the Dreyfus Strategic Value Fund (later renamed to BNY Mellon Dynamic Value Fund). As a result, Plaintiff Phillips has been financially harmed by Defendants' unlawful conduct. This information is known to Defendants as they have control and possession of all Plan participants' records. Plaintiff Phillips' account would have been worth more had Defendants not violated ERISA as described herein. Plaintiff Phillips became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

13.    Plaintiff Jeffrey Hunter resides in Shoreham, New York and was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because he and his beneficiaries were eligible to receive benefits under the Plan. During the Class Period, Plaintiff Hunter invested in the Plan's stable value fund, along with the other challenged funds, including the Janus Henderson Enterprise Fund, MFS New Discovery Value Fund, American EuroPacific Growth Fund, John Hancock Disciplined Value Mid Cap Fund, and the Dreyfus Strategic Value Fund (later renamed to BNY Mellon Dynamic Value Fund). As a result, Plaintiff Hunter has been financially harmed by Defendants' unlawful conduct. This information is known to Defendants as they have control and possession of all Plan participants' records. Plaintiff Hunter's account would have been worth more had Defendants not violated ERISA as described herein. Plaintiff Hunter became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

**The Plan**

14.    The Plan was established effective July 1, 2002. Prior to October 1, 2018, the Plan's name was the Brookhaven Memorial Hospital Retirement Savings Plan. The Plan is a defined contribution plan, within the meaning of 29 U.S.C. § 1002(34), covering substantially all employees of the Hospital, who have met the age and service requirements of the Plan. As of December 31, 2022, the Plan had 2309 participants with account balances and $246,951,879 in net assets.

**Defendants**

15.    Defendant Hospital maintains its place of business at 101 Hospital Rd, Patchogue, NY 11772. The Plan's annual Form 5500 Reports filed during the Class Period identify the Hospital as the Plan's sponsor and Administrator. As per the annual Form 5500 Reports, The

Hospital "as the Plan administrator, controls and manages the operation and administration of the Plan."

16.    The Individual Defendants Robert Schwarz, Ernest Patrick Smith, Lisa Rose, Richard Margulis, James Maiorino, Walter Ladick, Mark Mulholland, Marc Adler, and Frederick C. Braun, III are current and past members of the Plan's Pension Committee during the Class Period. As members of the Pension Committee, the Individual Defendants controlled the decision-making process and are responsible for the conduct alleged herein.

17.    Thus, the Hospital and the Individual Defendants are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have the sole authority to amend or terminate, in whole or part, the Plan, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available.

18.    Though not named as Defendants, certain service providers are fiduciaries to the Plan participants and are parties in interest in the matter. Prudential Retirement Insurance and Annuity Company and Prudential Bank & Trust, F.S.B. serve as custodians to the Plan for certain investments. These entities are collectively referred to as "Prudential". The custodians hold the Plan's investment assets and execute investment transactions. Hornor Townsend and Kent is the Plan's financial consultant. In 2022, Prudential was renamed Empower Annuity Insurance Company. These entities are a "party-in-interest" to the Plan.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

19.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest

known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citing Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. §1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

20.    29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

21.    29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Prudential is a "parties in interest" under 29 U.S.C. §1106(a)(1)(C) and 29 USC § 1002(14).

22.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

10

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

23. 29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

24. Plaintiffs have relied upon publicly available information and limited documents provided by the Defendant Hospital, including quarterly statements provided to the Plaintiffs, the Plan's Annual Form 5500 Reports filed during the Class Period (which are "Open to Public Inspection" and available for download from https://www.efast.dol.gov/5500Search/), other publicly available Form 5500 Reports, and mutual fund prospectuses available on SEC's EDGAR database.

## FACTUAL ALLEGATIONS

25. In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34).

**A.**    **Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options**

26.    A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds and each share represents an investor's part ownership in the fund and the income it generates. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

27.    Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (i.e. sales) charges. Each class represents an identical interest in the mutual fund's portfolio. All share classes of mutual funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical - the managers, investment styles, and stocks are not merely similar, but identical. The principal difference between the classes is that the mutual fund will charge different marketing, distribution and service expenses depending on the class chosen. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan since institutional investors make large fund share purchases, and higher-class shares are typically retail class shares which are available to a broader spectrum of investors. The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

28.     Defendants had access to these low-cost institutional share classes of mutual funds, as the Plan could easily meet the minimum investment requirements. Instead of monitoring and taking advantage of volume discounts in purchasing mutual fund shares, Defendants instead offered higher cost mutual fund share classes as investment options for the Plan. Thus, the Plan fiduciaries wasted the assets of the Plan by failing to monitor the available share classes and to select the lowest share class of the funds for inclusion in the plan menu. This failure continued from the beginning of the class period until at least 2022 (the latest year for which details of investment options are currently available to Plaintiffs).

29.     The following are instances, in which Defendants wasted money by failing to select the lowest-cost share class of the mutual fund as an investment option for the Plan:

30.     Defendants chose Janus Henderson Enterprise Fund as an investment option available to participants in or prior to 2018. Defendants chose to invest in share class "T" in 2018 ("JAENX"). As per the 2018 statement for the quarter ending on December 31, 2018, the Plan's chosen share class "T" had the expense ratio of 0.92% for the year 2018. During the same year, other shares classes such as share class "N" had an expense ratio of 0.67% (as of January 26, 2018)[4] and 0.66% (as of January 28, 2019)[5]. This option was available to the Defendants and easily identifiable, as it was disclosed in the Janus Henderson Enterprise Fund's summary prospectuses. Moreover, these prospectuses noted that share class "N" had no investment minimum requirements for retirement investors. Defendants however continued to keep the Plan's investments in share

---

[4]     *See* Form 497K, Janus Henderson Enterprise Fund, Summary Prospectus (January 26, 2018), https://www.sec.gov/Archives/edgar/data/277751/000119312518020475/d448934d497k.htm.

[5]     *See* Form 497K, Janus Henderson Enterprise Fund, Summary Prospectus (January 28, 2019), https://www.sec.gov/Archives/edgar/data/277751/000119312519017328/d610895d497k.htm.

class "T" which had a significantly higher expense ratio until 2022, incurring 0.91% for the years 2019-2022. During this same time, share class "N" had an expense ratio of 0.66% until 2023.[6] From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

31.    Defendants chose MFS New Discovery Value Fund as an investment option available to participants in or around 2019. Defendants chose to invest in share class "R3" in 2019 ("NDVTX"). As per the 2019 statement for the quarter ending on December 31, 2019, the Plan's chosen share class "R3" had the expense ratio of 1.28% for the year 2019. During the same time, another shares class "R6" had an expense ratio of 0.97%, as of June 28, 2018.[7] This option was available to the Defendants and easily identifiable, as it was disclosed in the MFS New Discovery Value Fund's summary prospectuses. Moreover, these prospectuses noted that share class "R6" had no investment minimum requirements. Defendants however continued to keep the Plan's investments in share class "R3" which had a significantly higher expense ratio until 2022, incurring 1.22% for 2020, 1.23% for 2021 and 1.18% for 2022. During this same time, share class "R6" had

---

[6]    *See* Form 497K, Janus Henderson Enterprise Fund, Summary Prospectus (January 28, 2020), https://www.sec.gov/Archives/edgar/data/277751/000119312520015731/d863393d497k.htm; Form 497K, Janus Henderson Enterprise Fund, Summary Prospectus (January 28, 2021), https://www.sec.gov/Archives/edgar/data/277751/000119312521019459/d42442d497k.htm, Form 497K, Janus Henderson Enterprise Fund, Summary Prospectus (January 27, 2023), https://www.sec.gov/Archives/edgar/data/277751/000119312523016480/d429340d497k.htm.

[7]    *See* Form 497K, MFS New Discovery Value Fund, Summary Prospectus (June 28, 2018), https://www.sec.gov/Archives/edgar/data/356349/000110465918042452/a18-14977_7497k.htm.

14

an expense ratio of 0.92% (as of June 28, 2019[8]), 0.87% (as of June 26, 2020[9] and June 28, 2021[10]), 0.83% (as of June 28, 2022[11]) and 0.84% (as of June 28, 2023)[12]. From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

32.    Defendants chose John Hancock Disciplined Value Mid Cap Fund as an investment option available to participants in or prior to 2018. Defendants chose to invest in share class "I" in 2018 ("JVMIX"). As per the 2018 statement for the quarter ending on December 31, 2018, the Plan's chosen share class "I" had the net expense ratio of 0.85% for the year ending 2018. During the same year, other shares classes such as share class "R6" had a net expense ratio of 0.76% (as of July 1, 2018).[13] This option was available to the Defendants and easily identifiable, as it was

---

[8]    *See* Form 497K, MFS New Discovery Value Fund, Summary Prospectus (June 28, 2019) (as amended July 15, 2019 and August 14, 2019), https://www.sec.gov/Archives/edgar/data/356349/000091293819000459/ndv_sum.htm.

[9]    *See* Form 497K, MFS New Discovery Value Fund, Summary Prospectus (June 26, 2020), https://www.sec.gov/Archives/edgar/data/356349/000110465920076681/a20-21283_8497k.htm.

[10]    *See* Form 497K, MFS New Discovery Value Fund, Summary Prospectus (June 28, 2021), https://www.sec.gov/Archives/edgar/data/356349/000110465921086173/a21-20840_2497k.htm.

[11]    *See* Form 497K, MFS New Discovery Value Fund, Summary Prospectus (June 28, 2022) (as Amended December 8, 2022), https://www.sec.gov/Archives/edgar/data/356349/000091293822000489/ndv_sum_120822.htm.

[12]    *See* Form 497K, MFS New Discovery Value Fund, Summary Prospectus (June 28, 2023), https://www.sec.gov/Archives/edgar/data/356349/000110465923075036/tm2317486d4_497k.htm.

[13]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (July 1, 2018) (as revised July 9, 2018) https://www.sec.gov/Archives/edgar/data/1329954/000113322818004428/e498194_497k.htm.

disclosed in the John Hancock Disciplined Value Mid Cap Fund's summary prospectus and the Plan met all criteria and investment minimums. Defendants however continued to keep the Plan's investments in share class "I" which had a significantly higher expense ratio until 2022, incurring a net expense ratio of 0.86 % for the years 2019-2021 and 0.85% for the year 2022. During this same time, share class "R6" had a net expense ratio of 0.76% (as of August 1, 2019[14]) and 0.75%[15] until 2023.  From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

33.    Defendants chose American EuroPacific Growth Fund as an investment option available to participants in or prior to 2018. Defendants chose to invest in share class "R4" in 2018 ("REREX"). As per the 2018 statement for the quarter ending on December 31, 2018, the Plan's chosen share class "R4" had the expense ratio of 0.83% for the annual year ending 2018. During

---

[14]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2019)
https://www.sec.gov/Archives/edgar/data/1329954/000113322819004941/jhfiii-html1474_497k.htm.

[15]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2020)
https://www.sec.gov/Archives/edgar/data/1329954/000113322820004784/jhfiiidvmcf-html2835_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2021)
https://www.sec.gov/Archives/edgar/data/1329954/000113322821004156/jhfiiidvmcf-html3889_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2022)
https://www.sec.gov/Archives/edgar/data/1329954/000113322822005192/jhdvmcf-html5285_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2023)
https://www.sec.gov/Archives/edgar/data/1329954/000119312523199513/d519336d497k.htm.

the same year, another shares class "R6" had an expense ratio of 0.49%, as of June 1, 2018.[16] This option was available to the Defendants and easily identifiable, as it was disclosed in the American EuroPacific Growth Fund's summary prospectuses. Moreover, these prospectuses noted that there was no difference in investment minimum requirements between these share classes. Defendants however continued to keep the Plan's investments in share class "R4" which had a significantly higher expense ratio until 2022, incurring 0.84% for 2019 and 0.81% for 2020, 2021 and 2022. During this same time, share class "R6" had an expense ratio of 0.49% ( as of June 1, 2019[17]) and 0.46% for 2020 – 2022.[18] From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

34. Defendants chose Dreyfus Strategic Value Fund as an investment option available to participants in or prior to 2018. Defendants chose to invest in share class "I" in 2018 ("DRGVX"). As per the 2018 statement for the quarter ending on December 31, 2018, the Plan's chosen share class "I" had the expense ratio of 0.68% for the annual year ending 2018 (after deducting fee waivers and/or expense reimbursement). During the same year, another shares class

---

[16]    *See* Form 497K, American EuroPacific Growth Fund, Summary Prospectus (June 1, 2018) https://www.sec.gov/Archives/edgar/data/719603/000005193118000541/eupac497k.htm.

[17]    *See* Form 497K, American EuroPacific Growth Fund, Summary Prospectus (June 1, 2019) https://www.sec.gov/Archives/edgar/data/719603/000005193119000401/eupac497k.htm.

[18]    *See* Form 497K, American EuroPacific Growth Fund, Summary Prospectus (June 1, 2020) (as supplemented October 30, 2020) https://www.sec.gov/Archives/edgar/data/719603/000005193120001046/eupac497k.htm; Form 497K, American EuroPacific Growth Fund, Summary Prospectus (June 1, 2021) https://www.sec.gov/Archives/edgar/data/719603/000005193121000466/eupac497k.htm; Form 497K, American EuroPacific Growth Fund, Summary Prospectus (June 1, 2022) sec.gov/Archives/edgar/data/719603/000082362022000072/eupac497k.htm.

17

"Y" had an expense ratio of 0.64%, as of December 31, 2018.[19] This option was available to the Defendants and easily identifiable, as it was disclosed in the Dreyfus Strategic Value Fund's summary prospectuses for the prior years as well. For instance, share class "Y" had the same expense ratio of 0.64% in 2017.[20] Additionally, the Plan qualified for the lower cost share class as it maintained a balance of around $20.3 million approx. in the fund in 2018, far above the $1 million minimum investment requirement.  From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

35.    Investing Plan assets in higher share classes harms the Plan's participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants. Because the Plan could have invested in identical mutual funds with a lower share class, Defendants' actions were directly erosive to the Plan's growth. Defendants thus caused Plaintiffs and other Plan participants/ beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on the majority of investments offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

36.    In selecting share classes with a higher fee, Defendants demonstrated a lack of basic skill and prudence when selecting investments. A prudent fiduciary must have a viable

---

[19]    *See* Form 497K, Dreyfus Strategic Value Fund, Summary Prospectus (December 31, 2018), dreyfusstrategicvalu-1220181.htm - Generated by SEC Publisher for SEC Filing.

[20]    *See* Form 497K, Dreyfus Strategic Value Fund, Summary Prospectus (December 29, 2017), dreyfusstrategicvalu-1220173.htm - Generated by SEC Publisher for SEC Filing.

methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[21]

37.     The Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. Simply put, given the choice of two identical investments – with the same assets, investment style, and management – Defendants chose the more expensive product. Plaintiffs estimate that Defendants caused plan participants losses of around at least $1.02 million.  Defendants thus caused Plan participants/beneficiaries harm by forcing them to pay higher fees and causing lost yield and returns they rely on for retirement income. In doing so, Defendants undermined the very purpose of the Plan to provide income security for participants/beneficiaries.

**B.     Defendants Wasted Participants' Money Because They Failed to Appropriately Select and Monitor the Plan's Stable Value Fund**

38.     The single largest asset in the Plan was the Prudential Guaranteed Income Fund ("Prudential GIF"). The Prudential GIF is a type of stable value fund. A prudent fiduciary, recognizing the importance of the fund in the Plan's investment lineup, would have taken great care in selecting and monitoring this investment option. Defendants did not.

39.     A stable value fund is a unique investment available only in ERISA defined contribution plans and certain other tax-advantaged plans.  A stable value fund is a conservative,

---

[21]     "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at
https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-shareclass-initiative.pdf.

capital preservation investment product typically composed of high quality, low risk investments. It is designed to provide steady, positive returns and pay a contractually guaranteed return known as a "crediting rate." The crediting rate is set by the contract and may be reset at predetermined intervals.[22]

40.    A stable value account in a retirement plan is similar to a money market fund in that it provides liquidity and principal protection, and similar to a bond fund in that it provides consistent returns over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by guaranteeing the fund transacts at book value. Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with bond funds.

41.    In most cases, stable value products make use of special guaranteed investment contracts known as "GIC" or "wraps" that have their own risk and return characteristics.[23] In the vast majority of cases stable value funds are not mutual funds and typically are structured as: (i) an insurance company general account; (ii) an insurance company separate account; or, (iii) a

---

[22]    *See* generally Stable Value Investment Association, Knowledge, https://stablevalue.org/knowledge (follow links for "Glossary").

[23]    *Id* at https://www.stablevalue.org/wp-content/uploads/Stable-Value-FAQ.pdf *(*"The key difference between a GIC and a contract value wrap contract is that under a contract value wrap contract the ownership of the invested assets are owned by the plan…").

synthetic fund. The differences between the different types of funds are critical from a fiduciary standpoint.

42.     The Prudential GIF, the stable value fund selected by Defendants, is a type of a general account product subject to the terms of an investment contract between the Hospital and Prudential. Large retirement plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are slightly riskier, because there is only one "wrap" provider. As a result, they offer higher crediting rates. General account products, such as the Prudential GIF, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently must offer the highest rates.

43.     The crediting rate for the Prudential GIF was set in advance by Prudential and reset quarterly, as provided in the contract. Prudential pooled the assets of the Prudential GIF fund with those of other, unaffiliated retirement plans and invested them. For its fee, Prudential kept the "spread," i.e., the difference between the crediting rate amounts Prudential paid to participants and the returns generated on the pooled assets.

44.     The crediting rate is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. Defendants had an opportunity and duty to evaluate the stable value fund in advance. Thus, this is not a case of judging an investment with the benefit of hindsight. Defendants should have known, from the outset, that Prudential provided better crediting rates for the identical stable value fund (the Prudential GIF) and that substantially similar products were available offering significantly higher crediting rates.

45.   Defendants did not have a prudent process for selecting or monitoring the performance of the Prudential GIF. While not all information is publicly available for comparison purposes[24], limited documentation shows that Prudential provided better crediting rates ***for the identical stable value fund (the Prudential GIF)*** to other plans. For example, Prudential paid over twice as much to the participants in the WEA Plan. In addition, plan participants of the Jack Henry & Associates, Inc., Savings/Retirement Plan received a better crediting rate for the ***identical product*** (the Prudential GIF) from Prudential. According to data from the Fi360 stable value fund database, Prudential GIF's crediting rates were much higher than the crediting rate provided to the Defendant Hospital's Plan. A comparison of the different crediting rates for the Prudential GIF is provided below:

| Year | Defendant Hospital's crediting rate | WEA Plan's crediting rate | Jack Henry & Associates, Inc., Savings/Retirement Plan's crediting rate[25] | Fi360 crediting rate |
|---|---|---|---|---|
| 2018 | 1.65% | 3.15% | Information not available | Information not available |
| 2019 | 1.55% | 3.25% | 2.25% | Information not available |
| 2020 | 1.15% | 3.00% | 1.85% | Information not available |

---

[24]   In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators, (NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed. This limits the ability of plan sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility."

[25]   These crediting rates are publicly available as part of the complaint filed in *Lacrosse v. Jack Henry & Associates, Inc. et al*, Docket No. 3:23-cv-05088 (W.D. Mo. Oct 09, 2023).

| 2021 | 1.05% | Information not available | 1.75 % | Information not available |
| 2022 | 1.35% | Information not available | 2.05% | 3.00% |
| 2023 | 1.50% | Information not available | 2.05% | 3.30% |

46.    Further, Prudential paid over twice as much to the participants in the Mitsubishi Savings Plan for a similar stable value fund i.e. the Prudential Guaranteed Interest Account ("Prudential GIC")[26]:

**Mitsubishi Plan**

| Year | Defendant Hospital's crediting rate | Mitsubishi Plan's crediting rate | Excess Rate | Loss in Returns (in USD) |
|---|---|---|---|---|
| 2018 | 1.65% | 3.00% | 1.35% | 698,421.16 |
| 2019 | 1.55% | 3.00% | 1.45% | 817,027.55 |
| 2020 | 1.15% | 3.00% | 1.85% | 1,216,329.95 |
| 2021 | 1.05% | 3.00% | 1.95% | 1,320,434.15 |
| 2022 | 1.35% | 3.00% | 1.65% | 1,184,972.37 |
| 2023 | 1.50% | 3.00% | 1.50% | 1,080,000. |
| Total: | | | | **$6,317,185.19** |

47.    The Prudential GIC is substantially similar to the Plan's stable value fund, the Prudential GIF. Both are general account products by the same provider (Prudential) and have liquidity constraints and other risks. As detailed above, general account products are the riskiest type of stable value funds. Thus, to remain competitive, most general account products share similar risk profiles. For Prudential GIF, there is a general 90-day period before funds can be transferred, and for Prudential GIC, a plan can choose to either pay a fee and transfer or transfer the funds without any fees in five annual installments. However, these provisions are contract-

---

[26]    These crediting rates are publicly available as part of the complaint filed in *Humphries v. Mitsubishi Chemical America, Inc. et al.,* Case No. 1:23-cv-06214-JLR (S.D.N.Y.).

23

specific, and a plan can negotiate the specifics of such provisions. Plaintiffs do not have access to either the Plan's contract or the comparator contracts, as this information in non-public.

48.    Prudential also paid over twice as much to participants in the CIGNA Plan for the Prudential Guaranteed Long Term Fund, another similar stable value fund [27]:

**CIGNA Plan**

| Year | Defendant Hospital's stable value fund | CIGNA Plan | Excess Rate | Loss in Returns (in USD) |
|------|------|------|------|------|
| 2018 | 1.65% | 3.80% | 2.15% | 1,112,300.37 |
| 2019 | 1.55% | 3.80% | 2.25% | 1,267,801.38 |
| 2020 | 1.15% | 3.20% | 2.05% | 1,347,825.08 |
| 2021 | 1.05% | 3.20% | 2.15% | 1,455,863.3 |
| 2022 | 1.35% | 3.20% | 1.85% | 1,328,605.38 |
| Total: | | | | **$6,512,395.51** |

49.    The Prudential Guaranteed Long Term Fund is substantially similar to the Plan's stable value fund, the Prudential GIF. Both are general account products by the same provider (Prudential) and share almost identical liquidity constraints and other risks:

| Prudential Guaranteed Long Term Fund[28] | The Prudential GIF[29] |
|------|------|
| In most circumstances, Participants may not directly transfer amounts from GLTF to a competing fund. A transfer out of this investment must be directed to and remain in a non-competing fund for a period of 90 days before it can be invested in a competing fund. Competing funds are generally short-term fixed income | In most circumstances, Participants may not directly transfer amounts from Guaranteed Income Fund to a competing fund. A transfer out of this investment must be directed to and remain in a non-competing fund for a period of 90 days before it can be invested in a competing fund. Competing funds are generally short- |

[27]    These crediting rates are publicly available as part of CIGNA's Form 5500 Reports.

[28]    *See* Prudential Guaranteed Long Term Fund Fact Sheet, https://www.retirement.prudential.com/RSO/web/fundsheets/4C25-AC99-FEB65C8E630B.PDF.

[29]    *See* Prudential GIF Fact Sheet, https://www.retirement.prudential.com/RSO/web/fundsheets/471C-BFA4-A46F3C1E73B2.PDF.

| | |
|---|---|
| investments, money market funds or stable value investments that may be available as a Plan investment option. However, the transfer provisions and competing fund definitions may differ depending on the provisions of the group annuity contract. Empower reserves the right to defer certain withdrawals from GLTF assets if the amount of withdrawals to date for the contract is greater than 10% of the contract's beginning balance for that calendar year. | term fixed income investments, money market funds or stable value investments that may be available as a Plan investment option. However, the transfer provisions and competing fund definitions may differ depending on the provisions of the group annuity contract. A "pool" consists of similar contracts that are funded with us in the same calendar year. Empower reserves the right to defer certain withdrawals from GIF assets if the amount of withdrawals and transfers to date for that pool is greater than 10% of the pool's beginning balance for that calendar year. However, distributions resulting from a plan participant's termination of employment, retirement, death or disability, hardship withdrawals and minimum required distributions will always be paid in full and not deferred. |

50.    If Defendants had diligently examined the stable value fund market, they would have obtained a significantly higher crediting rate than even the highest Prudential GIF rate during the Class Period. According to publicly available information, at least six stable value funds from Prudential's major competitors had crediting rates of at least 3.15%—and often even higher—throughout the Class Period: TIAA Cref Retirement Choice, TIAA Cref Retirement Choice Plus, MassMutual Core SAGIC, MassMutual Core SAGIC II, MassMutual Diversified SAGIC; and MassMutual Diversified SAGIC II. The Plan fiduciaries had a duty to monitor the cost of the Prudential GIF and compare returns with these competitor stable value funds. The Plan fiduciaries knew that Prudential would be compensated by the spread, the difference between the return to the participants and Prudential's earnings of the stable value fund paced in its general account, and therefore Prudential would not be motivated to offer higher rates to the Plan. Defendants were

obligated to negotiate with Prudential for better crediting rates and shop for comparable stable value funds offering higher contractual rates.

51.    The TIAA comparators offered the highest crediting rates, resulting in substantial losses during the proposed Class period, as set forth below:

### TIAA Cref Retirement Choice

| Period Range | The Hospital's stable value fund | TIAA RC | Excess Rate | Loss in Returns (in USD) |
|---|---|---|---|---|
| 2018 | 1.65% | 4.35% | 2.70% | 1,396,842.33 |
| 2019 | 1.55% | 4.35% | 2.80% | 1,577,708.38 |
| 2020 | 1.15% | 3.90% | 2.75% | 1,808,058.04 |
| 2021 | 1.05% | 3.90% | 2.85% | 1,929,865.30 |
| 2022 | 1.35% | 4.25% | 2.90% | 2,082,678.70 |
| 2023 | 1.50% | 6.25% | 4.75% | 3,420,000.00 |
| Total: | | | | **$12,215,152.8** |

### TIAA Cref Retirement Choice Plus

| Period Range | The Hospital's stable value fund | TIAA RC Plus | Excess Rate | Loss in Returns (in USD) |
|---|---|---|---|---|
| 2018 | 1.65% | 3.60% | 1.95% | 1,008,830.57 |
| 2019 | 1.55% | 3.60% | 2.05 % | 1,155,107.92 |
| 2020 | 1.15% | 3.15% | 2.00% | 1,314,951.30 |
| 2021 | 1.05% | 3.15% | 2.10% | 1,422,006.01 |
| 2022 | 1.35% | 3.50% | 2.15% | 1,544,054.90 |
| 2023 | 1.50% | 5.50% | 4.00% | 2,880,000.00 |
| Total: | | | | **$9,324,950.71** |

52.    Both the TIAA products are general account products, with liquidity constraints comparable to the Plan's stable value fund. The TIAA Cref Retirement Choice product generally allows lumpsum withdrawals after 120 days with a 2.5% surrender charge[30], the TIAA Cref

---

[30]    See TIAA Cref Retirement Choice, https://fluenttech.tiaa.org/pdf/factsheet/878094101-TIAAPRC.pdf.

Retirement Choice Plus product allows lumpsum withdrawals and transfers at any time with no surrender charge and under some contracts, transfers to competing funds must first be transferred to non-competing funds where it must remain for 90 days (similar to the Prudential GIF)[31]. As general account products, the high returns are the plan's get for the give: the high risks involved. However, TIAA provided the high returns and Prudential GIF did not.

53.    Prudential's other major competitor, MassMutual also provided significantly higher contractual returns. According to data from the Blue Prairie stable value fund database, which provides data through 2019, the following four MassMutual products had the following average crediting rates from December 31, 2011 through December 31, 2019: 4.05% (MassMutual Core SAGIC); 4.1% (MassMutual Core SAGIC II); 4.09% (MassMutual Diversified SAGIC); and 4.12% (MassMutual Diversified SAGIC II). Thus, over an eight-year period—which overlaps with a portion of the Class Period—these four MassMutual GICs' average crediting rates differed by only 0.07%. Additionally, MassMutual Diversified SAGIC offered the following rates throughout the Class period, which were significantly higher: 4.03% (Apr. 1, 2020-June 30, 2022); 3.66% (Jan. 1, 2023- June 30, 2023); 3.81% (July 1, 2023-Dec. 31, 2023); and 3.49% (Apr. 1, 2024-June 30, 2024). The MassMutual Products are all separate account products, which have lower risk than the Prudential GIF, yet they all offered higher crediting rates.

54.    There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated: the product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows from the date the product is selected what the returns will be at

---

[31]    See TIAA Cref Retirement Choice Plus, https://fluenttech.tiaa.org/pdf/factsheet/878094101-TIAAPRCP.pdf.

27

least 3 months in advance. The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than a bond fund. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the Prudential product, generally continues to perform poorly, in a stable manner. A prudent fiduciary – that is, a fiduciary that monitors the investment and understands the pricing mechanism – would have known that Prudential GIF was underperforming and, being a *stable* value product, would continue to underperform in a stable manner.

55.     Defendants, to have a viable methodology, had to monitor and evaluate the returns on the stable value product as they were set, in three-month intervals, such as to compare them to the returns of the dominant player in the industry. Had Defendants done anything prudent to monitor and evaluate the returns – such as comparing the Plan returns to the returns of other leading stable value providers – Defendants would have learned that the Prudential fund, in addition to being a general account product, was an underperforming fund for the entire Class Period. Had the Defendants done even a minimal amount of due diligence, they would have immediately recognized that this was a severely underperforming product and would have had no option but to remove the Prudential stable value option from the Plan.

56.     This is particularly significant here, where Prudential, the stable value provider, was also the recordkeeper to the Plan. General account stable value funds can be tremendously profitable for the issuing insurance company, because of the spread. The profit to Prudential and the corresponding cost to the Plan should have been taken into account in selecting and setting Prudential's compensation as recordkeeper.

28

57.     Defendants did not have to scour the marketplace to find a better performing fund. The terms and rates of stable value funds are published and readily available. All they had to do was look. Defendants simply did not bother to find a better deal for the Plan participants. They therefore did not exercise even a minimal amount of due diligence.

58.     This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $12.2 million of participants' retirement savings (or at least $6.3 million if the lowest option is considered). This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be three months in advance.

59.     A stable value product is less sensitive to changes in interest rates than conventional bond funds. Stable value funds are just that: stable. A stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the fund selected by Defendants, generally continues to perform poorly, also in a stable manner. A prudent fiduciary would have known that the Prudential GIF would underperform and that, being a stable value product, it would continue to underperform. Defendants should not have selected the Prudential GIF. Certainly, as it continued to underperform, Defendants should have removed and replaced it.

## CLASS ACTION ALLEGATIONS

60.     ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. 1109(a) for a plan fiduciary's breach

29

of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. See 29 U.S.C. § 1132(a)(2).

61.    Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify a class action on behalf of participants and beneficiaries of the Plan. Plaintiffs seek to certify the following Class, and to be appointed as representatives ("Named Plaintiffs") of the Class:

> All participants in or beneficiaries of the Brookhaven Memorial Hospital Medical Center DBA Long Island Community Hospital Retirement Savings Plan from six years prior to the filing of the initial complaint in this matter through the date of judgment, except Defendants.

62.    This action meets the requirements of Fed. R. Civ. P. 23 and is certifiable as a class action for the following reasons:

a.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2022, the Plan had over 2309 participants with account balances.

b.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Defendants are fiduciaries to the Plan;

- whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

- whether Defendants breached their duty to monitor other fiduciaries and parties of interest to the Plan; and

- the extent of damage sustained by Class members and the appropriate measure of damages

63. Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general.

64. Plaintiffs have no interests that conflict with those of the Class.

65. Defendants do not have any unique defenses against the Plaintiffs that would interfere with their representation of the Class.

66. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>

### Breach of Fiduciary Duties

67. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

68. Defendants failed to discharge their duties under 29 U.S.C. § 1104(a)(1)(A) and (B). They were obligated to discharge their duties to the Plan and its participants with the care, skill, prudence and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

31

69.     Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

70.     As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached their fiduciary duties in various ways. Specifically, among other failings, Defendants (i) failed to investigate the availability of lower-cost share classes of certain mutual funds; and (ii) failed to prudently select and monitor the Plan's stable value fund, including failing to have a credible basis to conclude that the investment professionals responsible for carrying out its investment strategy were competent to do so successfully, and failing to appropriately monitor and supervise their performance.

71.     Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to Plan participants to date.

72.     As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

A.      Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Find and declare that the Defendants breached their fiduciary duties as described above;

C.      Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

D.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

E.      Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

F.      Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

G.      Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

H.      Order the payment of interest to the extent it is allowed by law; and

I.      Grant other equitable or remedial relief as the Court deems appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury of all issues so triable by law.

Dated: March 31, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Gustavo F. Bruckner*
Gustavo F. Bruckner
Samuel J. Adams
Ankita Sangwan
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
sjadams@pomlaw.com
asangwan@pomlaw.com

*Attorneys for Plaintiffs*

34